NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0306n.06

No. 12-3515

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Mar 27, 2013*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| CARMELLA L. AMICK, et al., | ) |
| | ) |
| Plaintiffs-Appellants, | ) |
| | ) |
| v | ) |
| OHIO DEPARTMENT OF REHABILITATION & | ) |
| CORRECTION, et al., | ) |
| | ) |
| Defendants-Appellees. | ) |
| | ) |

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
SOUTHERN DISTRICT OF
OHIO

O P I N I O N

BEFORE:  DAUGHTREY, McKEAGUE and GRIFFIN, Circuit Judges.

**McKEAGUE, Circuit Judge.**  This case stems from the death of Harry J. Amick while incarcerated in an Ohio prison.  The decedent's estate brought suit against various corrections entities and employees, asserting claims under 42 U.S.C. § 1983 for deliberate indifference to serious medical needs and failure to protect.  The district court dismissed all claims under Fed. R. Civ. P. 12(b)(6).  Plaintiffs contend the district court improperly failed to construe the facts alleged in their favor.  For the reasons that follow, the district court's ruling is affirmed in part and reversed in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Harry J. Amick was forty-seven years old at the time of his death while imprisoned on September 18, 2008.  He had suffered from schizoaffective disorder for most of his life, for which

---

[1]This fact summary is drawn essentially from the allegations of plaintiffs' first amended complaint, accepted as true for present purposes.

he had been prescribed psychotropic medications by various mental health professionals. During the last months of his life, while incarcerated, these medications were withdrawn. This may have contributed to manifestation of increasing symptoms, which may have played a role in his death at the hands of another inmate.

On November 7, 2007, Amick was taken into custody at the Cuyohoga County Corrections Center. There psychotropic medications were prescribed, specifically zyprexa and depakote. On April 8, 2008, Amick was sentenced to four years' imprisonment and ordered to remain on his psychotropic medications.

Amick was transferred to a state prison facility, Lorain Correctional Institution, on April 14, 2008. There Amick was diagnosed with schizoaffective disorder and his prescription for zyprexa and depakote was maintained. However, it was determined that Amick did not need mental health services and administration of his medications was tapered. As a result, Amick stopped receiving zyprexa on April 28, 2008. On April 29, 2008, he was transferred to another correctional facility, Madison Correctional Institution. Amick was again diagnosed with schizoaffective disorder and depakote was prescribed, but Amick was deemed not to need mental health services and he no longer received depakote after May 1, 2008.

Amick was transferred to Belmont Correctional Institution on June 3, 2008, where he was diagnosed with schizoaffective disorder, but no medications were prescribed and mental health services were deemed unnecessary. Three months later, Amick began to experience delusions and hallucinations and his behavior became more aggressive. On September 17, 2008, Amick visited the mental health department at Belmont seeking help. He was seen by a social worker on

September 18, who concluded Amick was only "med seeking," but she referred him to a physician, a psychiatrist, who likewise examined Amick and determined that medications were unnecessary.

Amick was then assigned to a cell with an inmate named Vonquez Henderson. This was allegedly contrary to an order to place Amick in a single cell due to his involvement in altercations with other prisoners. Within several hours after being placed in the cell with Henderson, in the afternoon on September 18, the two men began fighting. Although inmates reportedly "yelled, screamed, and made lots of noise to try to summon a corrections officer for help," some thirty minutes elapsed before help arrived. By the time officers reached the cell, Henderson had Amick in a choke hold. Amick was not breathing and did not have a pulse. He was transported to the hospital, where he was pronounced dead.

This action was commenced on September 16, 2009 by Amick's mother Carmella L. Amick, Administratrix of the Estate, and by Amick's wife Michelle Amick, on her own behalf and on behalf of their minor children, Harry and Ashley. The district court permitted the filing of an amended complaint on April 15, 2011. The first amended complaint asserts claims against twenty-four individual defendants, including Vonquez Henderson and twenty-three individuals who were involved in Amick's custody and care while imprisoned.[2] Also named as defendants are three corporate entities who had contracted with the Ohio Department of Rehabilitation and Correction to provide mental health services for inmates.[3]

---

[2]The action against defendant Vonquez Henderson plays no role in this appeal.

[3]Plaintiffs have settled their claims against all three of the corporate entities.

The amended complaint asserts fourteen causes of action, including claims under 42 U.S.C. § 1983 for violation of Amick's constitutional right to freedom from cruel and unusual punishment, and numerous state law claims. The twenty-three individual defendants moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6). The district court granted the motion, dismissing all claims. On appeal, plaintiffs challenge only the dismissal of their § 1983 claims; specifically, their claims that defendants were deliberately indifferent to Amick's serious medical needs; that defendants were deliberately indifferent to Amick's need for protection from violent attacks by inmates; and that defendants' deliberate indifference to Amick's serious medical needs was the product of a policy or custom of deficient training and supervision. Plaintiffs contend the district court applied an erroneous legal standard in assessing the sufficiency of their fact allegations.

## II. ANALYSIS

### A. Standard of Review

The district court's dismissal of plaintiffs' claims for failure to state a claim for relief is reviewed de novo. *Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). However, "a legal conclusion couched as a factual allegation" need not be accepted as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs' obligation to provide the "grounds" for their claimed entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The factual allegations must "raise the right to relief above the speculative

level." *Id.* The complaint must state a claim that is plausible on its face, i.e., the court must be able to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Assessment of the facial sufficiency of the complaint must ordinarily be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). If a court does consider material outside the pleadings, the motion to dismiss must be treated as a motion for summary judgment under Fed. R. Civ. P. 56 and all parties must be given a reasonable opportunity to present all material pertinent to the motion. *Id.* However, a court may consider "exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein," without converting the motion to one for summary judgment. *Bassett*, 528 F.3d at 430.

## B. Deliberate Indifference to Serious Medical Needs

Plaintiffs allege that numerous defendants are liable for failing to provide treatment needed to control the symptoms of Amick's schizoaffective disorder, which caused the fight that resulted in his death. They attached to their complaint an affidavit by forensic psychiatrist Stephen G. Noffsinger, M.D., stating his opinion, upon review of Amick's relevant medical records, that

defendant mental health care givers not only breached the applicable standard of care in their treatment of Amick, but were deliberately indifferent to his needs.

The district court correctly recognized that deliberate indifference to an inmate's serious medical needs may amount to cruel and unusual punishment prohibited by the Eighth Amendment. *See Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010). The court also noted that deliberate indifference entails something more than mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To make out a valid claim, a plaintiff must satisfy an objective component and a subjective component. The objective component is satisfied by showing a sufficiently serious condition that denial of needed medical care would result in the unnecessary and wanton infliction of pain or pose a substantial risk of serious harm. *See Quigley v. Thai*, 707 F.3d 675, 681 (6th Cir. 2013); *Flanory*, 604 F.3d at 253. To satisfy the subjective component, a plaintiff must allege and ultimately prove that the defendant was aware of facts from which the inference could be drawn that a substantial risk of harm would exist if needed care were not provided, that the defendant actually drew the inference, and that the defendant acted in disregard of that risk. *Farmer*, 511 US. at 837; *Quigley*, 707 F.3d at 681-82.

Applying this standard, the district court noted that Amick had undergone six evaluations during the five months he was incarcerated in state facilities, all of which yielded the assessment that, despite the diagnosis of schizoaffective disorder, he did not need medications or other mental health treatment. The court concluded that this alleged history did not evidence conscious disregard of a known risk, but, at most, made out a claim for negligence. The court characterized plaintiffs' claim as consisting of allegations of inadvertent failure to provide adequate medical care or of

negligent diagnosis, which are insufficient to make out a claim for deliberate indifference to serious medical needs.

### 1. *Objective Component*

As to the objective component of plaintiffs' claim, the seriousness of Amick's condition, the complaint contains the following allegations:

> It is well known that psychotropic medication is necessary to regulate individuals diagnosed with schizoaffective disorder. Individuals with schizoaffective disorder who are not medicated may experience delusions and hallucinations involving all five senses and may become violent and attack other individuals without provocation.
>
> The longer that Harry Amick remained off his psychotropic medications, the intensity of his delusions and hallucinations from his schizoaffective disorder intensified.

R. 119 First Amended Complaint at 13, ¶¶ 51-52, Page ID # 742. The complaint does not otherwise define schizoaffective disorder. Nor does Dr. Noffsinger's affidavit, attached to the complaint, provide a definition.

Yet, even accepting as true the allegations that the withholding of medications exposed Amick to the possibility of experiencing delusions and hallucinations and becoming violent, plaintiffs' allegations reveal no hint of increasing symptomatology or behavioral problems during most of the five months he was incarcerated in state prison facilities. In other words, according to plaintiffs' own allegations, Amick would appear to have made an acceptable and unremarkable adjustment to prison life without medications for almost five months. It was only during the final days of his life that symptoms became manifest. Until then, the allegations do not suggest that Amick suffered from such a serious condition that denial of antipsychotic medications could be

expected to result in the unnecessary and wanton infliction of pain or pose a substantial risk of serious harm. Hence, the claim of deliberate indifference to serious medical needs against all defendants who had been involved in or responsible for Amick's mental health care until September 17 is facially deficient for its failure to satisfy the objective component requirement.

It is further alleged that Amick sought help from the mental health department at Belmont Correctional Institution on September 17 and spoke to a supervisor, defendant Jim Sall. Sall did not ignore or disregard the concern, but referred Amick for assessment by a mental health liaison. This assessment was conducted the very next day by defendant Patty Feoick, a social worker, who believed that Amick did not need mental health services, but was simply "med seeking." Despite her impression, however, Feoick referred Amick for examination by a psychiatrist, defendant Robert Turton, M.D. Dr. Turton evaluated Amick that same day and declined to prescribe any medications.

Though no medications were prescribed at this time, the determination was made—ostensibly in response to reports that Amick had experienced hallucinations and had been involved in altercations with other inmates—to place Amick in a single cell. These allegations of increased sympomatology, viewed in the light most favorable to plaintiffs, arguably satisfy the objective component element of the claim against defendants Sall, Feoick and Turton. It is reasonable to infer that these three defendants were involved in Amick's care during his final days and were privy to information suggesting that absent some precaution, Amick's reported hallucinations and inappropriate interactions with other inmates could expose him to a substantial risk of serious harm.

### 2. *Subjective Component*

Assuming these three defendants were aware of these facts and actually drew the inference that Amick was at risk of harm, the allegations still fall short of satisfying the subjective component. Sall did not ignore Amick's complaint, but referred Amick for assessment to determine whether and what intervention might be appropriate. Feoick conducted the initial assessment and, although she did not feel that medications were called for, she did not ignore Amick's concern, but referred him to Dr. Turton. Turton did not ignore Amick's condition, but conducted a psychological evaluation. Turton maintained the five-month long medication-free treatment approach, but it is reasonable to infer from the allegations that Turton either directed, concurred or acquiesced in the determination by the custodial staff to place Amick in a cell by himself. This change in Amick's custodial assignment appears to have been reasonably calculated to minimize the risk that Amick's condition would expose him to harm at the hands of another inmate. The allegations do not, therefore, support a finding that any of the mental health care defendants consciously disregarded a known risk. Unfortunately, the directive to place Amick in a single cell was not implemented. However, there is no basis for attributing deliberate-indifference fault for this error to the defendant mental health care givers.

Plaintiffs insist that Dr. Noffsinger's affidavit, attached to their complaint, and particularly his opinion that defendants were deliberately indifferent, is sufficient substantiation of the elements of their claim at the pleading stage. A relevant opinion by Dr. Noffsinger, a forensic psychiatrist, within his field of expertise, would be admissible and probative. However, Noffsinger's deliberate-indifference opinion is a legal conclusion that would be properly excluded under the Rules of

Evidence. *See Woods v. Lecureux*, 110 F.3d 1215, 1219-20 (6th Cir. 1997). Further, a "legal conclusion couched as a factual allegation" is still a legal conclusion and need not be accepted as true at the pleading stage. *Twombly*, 550 U.S. at 555. Plaintiffs' pleading obligation "requires more than labels and conclusions." *Id.* As tragic and seemingly avoidable as Amick's death was, the factual allegations of plaintiffs' complaint simply fall short of satisfying the subjective component of their claim for deliberate indifference to serious medical needs.

The Sixth Circuit recently affirmed the denial of a motion for summary judgment on a deliberate indifference claim against a prison psychiatrist stemming from his prescription of medication that may have contributed to his inmate patient's death. *Quigley*, 707 F.3d at 682-83. The record was deemed sufficient to allow a reasonable factfinder to conclude that the defendant consciously exposed his patient to an excessive risk of serious harm because the lethal danger associated with simultaneously ingesting both of the medications the inmate had been prescribed was well known within the psychiatric profession and therefore "obvious."

*Quigley* is distinguishable in two important respects. Here, the risk of harm did not proceed directly from the treatment prescribed and was not as obvious. Further, any potential risk of injury at the hands of another inmate, a risk that had newly become manifest, was to be minimized by assignment of Amick to a single cell. The risk of harm that Amick was exposed to was contingent and clearly not so obvious as to reasonably justify the inference that Dr. Turton consciously disregarded the risk when he addressed Amick's concern in a manner other than by prescribing medication.

Accordingly, we find no error in the district court's dismissal of the claim for deliberate indifference to Amick's serious medical needs.

### C. Failure to Train and Supervise

Plaintiffs' complaint purports to state a claim that defendants' violation of Amick's Eighth Amendment rights through their deliberate indifference to his serious medical needs was pursuant to a policy or custom of inadequate training or supervision. The district court dismissed the claim, finding (1) no allegation that any supervisor had implicitly authorized, approved or knowingly acquiesced in the alleged denial of Amick's rights; and (2) no allegation that any policy-making official knew or had reason to know that training was inadequate.

Again, we find no error. Once it was correctly determined that plaintiffs failed to sufficiently plead the underlying claim for deliberate indifference to serious medical needs, the basis for any claim that such a violation was pursuant to a policy or custom of inadequate training or supervision was fatally undermined. If the mental health care givers did not deprive Amick of a federally protected civil right, then their actions are not actionable as a deprivation pursuant to policy or custom. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007).

### D. Failure to Protect

Plaintiffs also allege that numerous corrections officers who were responsible for Amick's custodial care violated his Eighth Amendment right to freedom from cruel and unusual punishment by failing to protect him from violent attack by inmate Vonquez Henderson. Specifically, they allege that defendant Andrei L. Jackson "recklessly disregarded" a supervisor's order not to place Amick

in a cell with another inmate and instead placed Amick in a cell with Henderson. Plaintiffs allege that within several hours of being placed in the cell with Henderson, Amick attacked Henderson. Although "inmates yelled, screamed, and made lots of noise to try to summon a corrections officer," defendants who were responsible for making rounds in the segregation cells at Belmont—Willie R. Ford, Harry Wright, Jerry Gianangeli, Joseph Underwood and Richard Drake—allegedly disregarded Amick's need for protection for up to thirty minutes before removing Amick from Henderson's choke hold.

The district court recognized that the Eighth Amendment imposes a duty on corrections officers to take reasonable measures to protect prisoners from violence at the hands of other prisoners. The court dismissed the claim, however, holding that plaintiffs had not alleged that defendant Jackson was told *why* a single-cell placement was ordered for Amick. Absent allegation that Jackson was aware of the risk of harm that prompted the single-cell directive, the court concluded that Jackson could not be deemed to have consciously disregarded the risk when he placed Amick in Henderson's cell. Similarly, in regard to the defendant officers on duty in the segregation unit when the fight between Amick and Henderson occurred, the court held the complaint lacked allegations to support a finding that defendants heard the noise made by other inmates or were otherwise aware of the fight. Absent such an allegation, the court held defendants Ford, Wright, Gianangeli, Underwood and Drake could not be deemed to have consciously disregarded the risk of harm.

The failure to protect claim is governed by standards substantially similar to those applied to the claim for deliberate indifference to serious medical needs. To make out a prima facie claim

that defendants were deliberately indifferent to Amick's need for protection from assault by another inmate, plaintiffs' allegations must satisfy an objective component and a subjective component. *Farmer*, 511 U.S. at 835-38. The objective component is satisfied by allegations that absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm. *Id.* at 836. To satisfy the subjective component, a plaintiff must allege that the defendant was aware of facts from which the inference could be drawn that a substantial risk of harm would exist if reasonable measures were not taken, that the defendant actually drew the inference, and that the defendant acted in disregard of that risk. *Farmer*, 511 US. at 837. *See also Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010).

### 1. *Defendant Jackson*

For the reasons explained above, we find that plaintiffs have adequately alleged facts satisfying the objective component in relation to their failure to protect claim against defendant Jackson. That is, by the time Amick was ordered to be placed in a single cell, it appears to have been recognized that the symptoms of his schizoaffective disorder had reached a level where a single-cell placement was deemed appropriate to minimize the risk of harm that his condition posed to himself and other inmates.

It was at this point, according to the allegations, after defendant Jackson had been ordered by a supervisor not to place Amick in a cell with another inmate, that Jackson "recklessly disregarded" the order. The district court correctly observed that plaintiffs have not alleged that Jackson knew why he had been ordered to place Amick in a single cell. Yet, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. *See also Quigley*, 707 F.3d at 682.

The potential reasons for ordering a particular inmate placed in a single cell, where double-celling is apparently otherwise the norm, are limited in number. The measure is usually undertaken to avoid or minimize the risk of harm to one or both of the inmates who would otherwise be placed together. Even apart from whether Jackson specifically knew of the recent manifestation of Amick's symptoms or the reasons why Amick was being removed from the cell he had been assigned to, it would seem to be "obvious," under the teaching of *Farmer*, that Jackson's supervisor had ordered him to place Amick in a single cell to ensure inmate safety in the face of a perceived risk of harm. The notion implied by defendants' argument that Jackson disregarded his supervisor's order without even inquiring about the reason for it smacks of exactly the sort of deliberate indifference contemplated by the failure to protect cause of action.

The allegations of the claim against Jackson could be more explicit. Nonetheless, the complaint sufficiently alleges facts from which a reasonable factfinder could conclude, from the obviousness of the danger posed by double-celling Amick, that Jackson knew he was exposing Amick to a substantial risk of harm when he "recklessly disregarded" the order. The complaint states a claim that is "plausible on its face," one that gives rise to "more than a sheer possibility" that Jackson acted unlawfully. *See Twombly*, 550 U.S. at 556.

It is also possible that Jackson has an innocent explanation for placing Amick in Henderson's cell. The motion to dismiss tests only the facial sufficiency of the complaint. And reversal of the

dismissal merely allows proceedings to continue, in which Jackson can freely give his explanation. At this stage, it is enough that the factual allegations "raise the right to relief above the speculative level." *Id.* at 555. As the Court observed in *Twombly*, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Id.* at 556.

### 2. *Defendants Ford, Wright, Gianangeli, Underwood and Drake*

The failure to protect claim against the remaining five defendant corrections officers—Ford, Wright, Gianangeli, Underwood and Drake—arises from their alleged inaction after the very harm that single-celling was designed to prevent had swung into force. These defendants' alleged thirty-minute delay in responding to the fight between Amick and Henderson was allegedly caused by their deliberate indifference to the substantial risk of serious harm. The district court did not find and defendants do not seriously contend that the objective component of the claim is not met. A physical fight between two adult men in a locked cell clearly posed a substantial risk of serious harm.

The district court held, however, that the claim lacks the required allegation that defendants knew the fight was going on, in spite of the alleged noise made by neighboring inmates. The court held the allegation that one of the defendants allegedly heard but "waved off" one inmate as he called for help was insufficient. The court noted that plaintiffs failed to identify what, specifically, the inmate said and which defendant ignored his request. Absent allegation that defendants heard the commotion and were aware of the fight, the court concluded the alleged inaction of the defendants amounted to no more than negligence.

Again, the district court failed to view the allegations in the light most favorable to plaintiffs. The facts alleged are sufficient to plausibly suggest that a plea for help was communicated to at least

one and potentially all of the five defendant on-duty officers—i.e., the officers charged with responsibility for ensuring inmate safety in the segregation unit. Their alleged ignoring of the plea might ultimately be shown to amount to no more than mere negligence. However, sufficient facts have been stated to plausibly support the claim that defendants were deliberately indifferent to Amick's need for protection, such that "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

The following language from *Farmer* is instructive:

> "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." . . . Having incarcerated "persons with demonstrated proclivities for antisocial criminal, and often violent, conduct," . . . having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. . . . Prison conditions may be "restrictive and even harsh," . . . but gratuitously allowing the beating or rape of one prisoner by another serves no "legitimate penological objective" . . . any more than it squares with "evolving standards of decency." . . . Being violently assaulted in prison is simply not "part of the penalty that criminal offenders pay for their offenses against society."

*Farmer*, 511 U.S. at 833-34 (internal alterations and citations omitted).

Given that these five defendants were the government officials most directly responsible for ensuring inmate safety in the segregation unit on the afternoon of September 18; and assuming the truthfulness of plaintiffs' allegations that inmates in the segregation unit "yelled, screamed, and made lots of noise" in an effort to summon help after the fight broke out in Amick's cell; and assuming the truthfulness of the allegation that the plea for help was communicated to and ignored by at least one of the defendants; and assuming the truthfulness of the allegation that defendants disregarded the inmates' noise for up to thirty minutes, we conclude that the substantial risk of serious harm was

so obvious that a reasonable factfinder could conclude that defendants' delay in responding was due to conscious disregard of that risk. *See Farmer*, 511 U.S. at 842; *Quigley*, 707 F.3d at 682.

There may be a reasonable explanation for the delay. Recovery by plaintiffs may not be probable. However, the "plausibility standard is not akin to a probability requirement;" it requires only something "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Here, plaintiffs' allegations make out more than a sheer possibility of entitlement to relief.

We therefore hold that a plausible claim for deliberate indifference to Amick's need for protection has been stated and that further proceedings are justified. The order dismissing this claim must be set aside.

### III. CONCLUSION

In sum, the district court's order of dismissal is **AFFIRMED in part** and **VACATED in part**. For the reasons discussed above, the dismissal of plaintiffs' claim for deliberate indifference to serious medical needs is **AFFIRMED**, as is the dismissal of plaintiffs' claim that such deliberate indifference was pursuant to a policy or custom of inadequate training and supervision. However, the dismissal of plaintiffs' claim against defendants Andrei Jackson, Willie Ford, Harry Wright, Jerry Gianangeli, Joseph Underwood, and Ricky Drake, for deliberate indifference to Amick's need for protection from the risk of violence, is **VACATED** and the case is **REMANDED** for further proceedings.